

FILED

MAY - 3 2013

Clerk, U S District Court
District Of Montana
Billings

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| UNITED STATES OF AMERICA, | Cause No. CR-13-18-BLG-RFC |
|---|---|
| Plaintiff, | |
| v. | ORDER DENYING MOTION TO DISMISS |
| DOUGLAS VANCE CROOKED ARM, | |
| Defendants. | |

Defendant is named in a four-count Indictment alleging a conspiracy to traffic in eagles and migratory birds, between January 2008 and March 2009. All charges are brought under the Migratory Bird Treaty Act ("MBTA"). Presently before the Court is Douglas Vance Crooked Arm's motion to dismiss the Indictment. *Doc. 23.* Defendant argues that the MBTA does not abrogate their

1

usufructuary[1] rights as members of the Crow Tribe to profit from hunting and gathering on reservation lands. The Government opposes the motion.

## STANDARD OF REVIEW

Charges in an indictment may be dismissed prior to trial under Rule 12(b)(3)(B) Fed.R.Crim.P. for failure to state an offense. Rule 12 is not a device for a summary trial of the evidence and the inquiry is limited to the four corners of the indictment. *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). The Court must accept the truth of the indictment's allegation and determine whether a cognizable offense has been alleged. *Id.*

## ANALYSIS

Here, Crooked Arm's arguments for dismissal are all predicated on facts that do not appear on the face of the indictment, and that the Court cannot consider. *See, e.g.*, Doc. 24 at 8 ("Vance Crooked Arm has standing to assert rights under the 1851 and 1868 Fort Laramie Treaties. He is a member of the Crow Nation and a descendant of the individuals to whom the United States made promises"). To grant the motion, the Court would have to look beyond the four corners of the indictment and make the factual determinations that (e.g.), Crooked

---

[1] In the context of Native American treaties, a usufructuary right is the right to "make a modest living by hunting and gathering off the land." *United States v. Bresette*, 761 F.Supp. 658, 660 (D.Minn. 1991).

2

Arm is an enrolled member of the Crow Tribe that has standing to assert Tribal treaty rights, that the birds were killed on the Crow Reservation, or that the birds were killed, sold, or offered for sale by members of the Crow Tribe.

In interpreting the provisions of Indian treaties, courts must construe provisions as the Indians would have understood them. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970); *United States v. Shoshone Tribe*, 304 U.S. 111, 116 (1938). This understanding is illustrated by the history of the treaties, the negotiations that preceded them, and by the practical construction given the treaties by the parties. *Skokomish Indian Tribe v. France*, 320 F.2d 205, 207-08 (9th Cir. 1963), quoting *Choctaw Nation v. United States*, 318 U.S. 423, 431-32 (1943).

No Crow treaty right invalidates the MBTA. Nothing in the three treaties between the Crow Indians and the United States reserved the right to kill and sell eagles, hawks, or magpies. The 1825 treaty (7 Stat. 266) between the Crow and the United States does not guarantee commerce in hunted goods as an ongoing usufructuary right. The 1825 treaty says nothing whatsoever about hunting. The treaty also does not preserve any right to engage in the purchase or sale of any hunted goods. In Article 4, the treaty states:

> That the Crow tribe may be accommodated with such
> articles of merchandise, & c. as their necessities may

3

> demand, the United States agree to admit and license traders
> to hold intercourse with said tribe, under mild and equitable
> regulations ...

Treaty With the Crow Tribe, Article 4 (Aug. 4, 1825); 7 Stat. 266. Although courts must broadly interpret treaties in the light most favorable to Indians as they would have naturally understood them, *Washington v. Washington State Commercial Passenger Fishing Vessel*, 443 U.S. 658, 676 (1979), this provision cannot be understood as granting the right to kill and sell eagles, hawks, and magpies.

> The 1851 Treaty of Fort Laramie does address hunting to a limited extent:
>
> > It is, however, understood that, in making this recognition and acknowledgement, the aforesaid Indian nations do not hereby abandon or prejudice any rights or claims they may have to other lands; and further, that *they do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described.*

Treaty of Fort Laramie With Sioux, Etc., Article 5 (September 17, 1851), 11 Stat. 749(emphasis added). The preceding paragraphs outlined the "respective territories" of the Crow and the other tribes that were parties to the Treaty. The only reasonable interpretation of this paragraph is that the Indians involved in the treaty maintained their right to hunt, fish, and pass over the "tracts of country heretofore described." *Id.*; *see also Montana v. United States*, 450 U.S. 544, 548

4

(1981)("The [1851] treaty identified approximately 38.5 million acres as Crow territory and, in Article 5, specified that, by making the treaty, the tribes did not 'surrender the privilege of hunting, fishing, or passing over' any of the lands in dispute.").

Finally, Article II of the 1868 treaty that established the Crow Indian Reservation "set apart" a "district of country" "for the absolute and undisturbed use and occupation" of the Crow Indians. Treaty With the Crow Indians (May 7, 1868), 15 Stat. 649. Article IV of the 1868 treaty granted the Crow the right to hunt on the unoccupied lands of the United States outside the reservation boundaries. *Montana,* 450 U.S. at 559, n.7. If the Crow were granted the right to hunt outside their reservation they would certainly have the right to hunt on the land set aside for their "absolute and undisturbed use and occupation."

But even if these treaties grant Crow tribal members the right to hunt migratory birds, it is a different question whether the treaties grant Defendant the right to sell them. In *Bresette,* the court concluded that the Chippewa retained full usufructuary rights to hunt and sell migratory birds because there was historical evidence that they "harvested virtually everything on the landscape ... for their own immediate, personal use and for use as trade goods in commerce," and were "participants in an international market economy." 761 F.Supp. at 662.

On the contrary, the Ninth Circuit has held that the 1868 Fort Bridger Treaty did not reserve to Shoshone and Bannock Indians the right to sell eagle parts because there was no historical evidence that they did so. *United States v. Top Sky*, 547 F.2d 486, 487 (9th Cir.1976). *See also U.S. v. Dion*, 752 F.2d 1261, 1264 (8th Cir. 1985) (Yankton Sioux not entitled to kill and sell eagles — "no expectation of a treaty right to sell eagles existed, since there was no historical evidence of a practice of selling eagle parts and since such a practice was deplored as a matter of tribal custom and religion.").

Defendant presents no such historical evidence as of the time the Crow treaties were executed, and no case law establishes such a usufructuary right. In fact, killing and commercializing eagles and hawks is actually inimical and offensive to Crow religion and culture, just as it was for the Sioux in Dion and the Shoshone and Bannock Tribes in *Top Sky*. *See U.S. v. Hugs*, 109 F.3d 1375, 1379 (9th Cir. 1997)

## CONCLUSION

The Crow Indians could not reasonably understand any of their three treaties with the United States to guarantee them the right to kill or sell eagles,

hawks, or migratory birds in contravention of the MBTA. For those reasons, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (*doc. 23*) is **DENIED.**

Dated this 3rd day of May, 2013.

*/s/ Richard F. Cebull*
Richard F. Cebull
Senior United States District Judge